WARNER, J.
Appellant challenges his conviction for grand theft. The charges arose out of the non-performance of a contract to construct kitchen cabinets. Because we conclude that the state did not prove felonious intent, we reverse and direct the court to vacate appellant’s conviction and sentence.
The state charged appellant with grand theft. At trial, the state presented the following testimony in support of its case. A homeowner in Broward County decided to do some remodeling work in her kitchen. She saw an advertisement for William Morris Cabinetry, owned by appellant William Segal. The homeowner went out to appellant’s warehouse in the Margate Commerce Center on Banks Road and saw equipment at that location. Appellant told her that he was in the process of building a showroom. Thereafter, he came out to her house, and they discussed removing her old kitchen cabinets and replacing them, as well as replacing her bathroom cabinetry. Appellant made several computer-aided drawings of her cabinets and showed her a sample of the cabinet doors. Appellant wrote a proposal and suggested removing her drop ceiling in the kitchen to make the cabinets taller, which, appellant told the homeowner, may have required determining whether there were any structural or electrical barriers to its removal. The homeowner did not sign the proposal right away, since it was expensive. After reducing the price by adjusting the materials to be used, the homeowner agreed, signing the contract on July 10, 2007. The contract called for thirty-inch cabinets instead of the taller cabinets, as the homeowner had not decided whether she would remove the drop ceiling by the time the contract was signed. She wrote a check for $3,879 to appellant personally. The check was endorsed to appellant’s mother’s account and deposited the next day. Appellant said he would come the next day to remove the drop ceiling and that the cabinets would be ready in eight to twelve weeks. Appellant did not return the next day.
After a week, the homeowner employed a friend, an electrical contractor, to move an electrical panel prior to installing the cabinets. He also removed the drop ceiling, since appellant did not come to do it. Removing the drop ceiling took ten minutes.
Once the contract was signed, the homeowner wasn’t able to get in touch with appellant as frequently as she had prior to the signing of the contract, as he was not returning phone calls. After removing the drop ceiling and notifying appellant, he *741 called, saying he was “very glad” that the drop ceiling was removed and that there was “no problem” making the cabinets higher. Two weeks after signing the contract, appellant came to the home to take final measurements and told the homeowner that he owed her some money, since she decided not to include a certain cabinet insert.
After he left, she did not see him again. He told her he had to go north because his daughter had died. Appellant had given her the phone numbers of his mother and his girlfriend, a “referral,” in case she could not get in touch with him. She admitted that she was able to reach appellant through these contacts.
In the meantime, she and the electrical contractor removed the old cabinets in anticipation of installation of the new cabinets, even though removal was included in the contract with appellant. However, appellant did not show up to install the cabinets at any point.
Concerned about the lack of communication and appellant’s failure to install the cabinets, the homeowner sent letters to appellant asking him to get in touch with her since she had been a month without cabinets. Appellant did not respond to the letters. In October, she sent an email to the William Morris Cabinetry email address asking him to get in touch with her, saying that she would work with him. He did not respond to the email but did respond after the homeowner contacted appellant’s nephew. He wanted to give her the deposit back because he could not continue with the contract. Nevertheless, he never returned the deposit. He did not tell her that he had built any cabinets, because, the homeowner testified, she would have accepted them if he had.
The state introduced bank records showing that the homeowner’s check was deposited in appellant’s mother’s account. From there, a rent payment on appellant’s warehouse was paid, and a check for the remainder was written to appellant’s company account. That account showed a small amount of money charged to Lowe’s (a home improvement store), payments for rent on the warehouse, and withdrawals of amounts of cash. There were also several charges for food. The records showed multiple checks being returned for insufficient funds.
Appellant moved for a judgment of acquittal, arguing that the state had failed to prove an intent to steal or defraud. The prosecutor argued that the state had charged a continuing theft and that criminal theft “can also result in failure to return things that you don’t lawfully have or are not entitled to.” The court denied the motion, and the appellant testified in his defense.
Appellant testified that he had been a cabinet and furniture maker in Chicago prior to moving to Florida after a divorce. He incorporated William Morris Cabinetry, named after his father, in Florida. Since incorporating, he had seven jobs before this homeowner’s contract, and set up shop in Margate. He was going to make a showroom in front and use the back to manufacture the cabinets. He had a lot of equipment from his previous business in Chicago. He did not have a bank account for the business for the first two years of its existence because of credit problems associated with his divorce. He spent about $1,600 a month on advertising his business, and the homeowner had responded to one of these ads.
He spent a lot of time working on the contract with the homeowner. She came to his shop to look at cabinet styles. He drew several designs for the kitchen, but all of them were for thirty-inch cabinets, because the homeowner did not want to *742 remove the drop ceiling above her present cabinets. He had recommended its removal and installing taller cabinets. However, before he would be able to install taller cabinets he would have to know whether anything structural was behind the drop ceiling. In addition, electrical boxes would have to be moved, which would be the responsibility of the homeowner. In the end, though, the contract provided for thirty-inch cabinets.
The homeowner gave him a check for the deposit, which he deposited in his mother’s account, as he was using her account for his business. His mother then paid his rent on his warehouse, and he used the remainder and one other check to open up a business account. After receiving the deposit, he started cutting the material for the cabinets. He ordered materials from Lowe’s and also obtained a lot of materials on eBay. He bought much of the materials on credit cards, which he paid out of his mother’s account. Additionally, he used materials that he already had in his warehouse to begin working on the cabinets. He began using his business account but used it for both business and personal items. He testified that the materials he purchased amounted to more than the deposit the homeowner had given him.
Contrary to the homeowner’s testimony, he claims that she did not tell him that she had removed the drop ceiling until mid-September, after he had already built the thirty-inch cabinets. He complained to her about this change and the increased cost but she “did nothing but reject the thirty-inch cabinets.” Ultimately, he disposed of the cabinets that he had built for her.
He had given her many ways to contact him and admitted receiving the letters and the email. In October his business was struggling. He was paying rent but his mother was also helping him. He eventually closed his shop. Toward the end of the year, he had a stroke, and in January he had quadruple bypass surgery. He then sold his equipment.
After denying the renewed motion for judgment of acquittal, the court submitted the case to the jury, which found appellant guilty. Appellant then moved for new trial and for judgment of acquittal, both of which were denied. This appeal follows.
Appellant claims that the trial court erred in denying his motion for judgment of acquittal, because the state failed to prove the requisite intent for his grand theft conviction. “The standard of review for the denial of a motion for judgment of acquittal is de novo.” Ortiz v. State, 36 So.3d 901, 902 (Fla. 4th DCA 2010) (citing Pagan v. State, 830 So.2d 792, 803 (Fla.2002)).
Under Florida Statutes, a person commits theft if he “knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently ... [djeprive the other person of a right to the property or a benefit from. the property.” § 812.014(l)(a), Fla. Stat. (2007). This includes “[o]btaining property by fraud, willful misrepresentation of a future act, or false promise.” § 812.012(3)(c), Fla. Stat. (2007). “Florida law provides that to prove the crime of grand theft, the State must establish the defendant had the requisite criminal intent at the time of the taking.” Yerrick v. State, 979 So.2d 1228, 1230 (Fla. 4th DCA 2008) (emphasis supplied). “Even though a promise to perform in the future may serve as the basis of a theft, a necessary element of theft under Florida law is that the defendant must have the specific intent to commit the theft at the time of, or prior to, the commission of the act' of taking.” Stramaglia v. State, 603 So.2d 536, 537-38 (Fla. 4th DCA 1992) (emphasis in original) (citations omitted).
*743 “Intent, being a state of mind, is often not subject to direct proof and can only be inferred from circumstances.” Jones v. State, 192 So.2d 285, 286 (Fla. 3d DCA 1966). “At the same time, ‘in a circumstantial evidence case, the State’s evidence must be not only consistent with guilt but inconsistent with any reasonable hypothesis of innocence.’ ” Benitez v. State, 852 So.2d 386, 388 (Fla. 3d DCA 2003) (quoting Jeffries v. State, 797 So.2d 573, 580 (Fla.2001)).
Appellant cites to cases in support of his position that the state’s evidence is insufficient to prove a felonious intent. In Crawford v. State, 453 So.2d 1139 (Fla. 2d DCA 1984), the court held that the state had not proved intent to commit a grand theft in a contractual dispute. The defendant contracted with a homeowner to complete repairs on her roof, and the homeowner gave him a down payment of $240 to purchase materials, since she did not have the contract price of $400 at the time. The next day, the defendant arrived with only one bucket of tar, claiming that he had to order materials from Tampa and had not received them. The homeowner was upset, fired the defendant, and asked for her money back. He promised to return the money the next night but did not do so. After talking with the homeowner again, he again promised to return the money and again did not do so. The homeowner called the police, and the defendant admitted that he used the money to buy food for his family. The trial court denied the motion for judgment of acquittal, and the jury found the defendant guilty.
On appeal, the Second District vacated the conviction and sentence. The court found that the evidence was insufficient to show that the defendant “did not intend to perform the contract when he entered into it.” Id. at 1142. In so ruling, the Second District distinguished Brewer v. State, 413 So.2d 1217 (Fla. 5th DCA 1982), from Martin v. State, 379 So.2d 179 (Fla. 1st DCA 1980), both of which are cases dealing with grand theft convictions arising from contractual arrangements.
In Brewer, the defendant offered to obtain the return of stolen guns for the victim for $1,000, which the victim gave him. The defendant disappeared and was not heard from again until his arrest two years later. The Fifth District rejected the defendant’s argument that the state had not proved felonious intent because the defendant had merely failed to perform a future service. The court determined that the circumstantial evidence of the defendant’s disappearance showed an intent to take the money when it was delivered.
On the other hand, in Martin, in a case very similar to the present case, the defendant contracted with an owner to construct a small building. The owner provided a deposit to purchase materials, and the defendant cashed the check but never purchased the materials. Although the defendant did make a few telephone calls to the owner, no construction was ever started before the owner had the defendant arrested. The First District found that the state had not proved felonious intent, because the owner had voluntarily given the deposit to the defendant, and no misrepresentations were made to induce the deposit or contract. The defendant merely failed on a promise of future performance.
Noting that the statute now includes an amended definition of theft, which includes “willful misrepresentation of a future act or false promise,” the Crawford court determined that Brewer could be distinguished from Martin by the fact that in Brewer the defendant made no attempt to perform, whereas in Martin some small attempt to perform the contract was made:
Brewer appears to be distinguishable on its facts from Martin and the present case. In Brewer the defendant made no *744 effort to perform the undertaking. He took the money and was neither seen nor heard from until he was arrested. Brewer’s lack of effort to perform after receiving the money was evidence of the requisite criminal intent. On the other hand, in Martin, where the starting date was not definite and the defendant was making some effort to resolve the problem, there was insufficient evidence to support the finding of a criminal intent.
453 So.2d at 1142. Thus, evidence of actual performance of some portion of the contract negates an intent not to perform at the inception of the contract. In Crawford, the defendant’s attempt to perform, albeit minimal, negated any felonious intent at the time the contract was entered and deposit paid.
In Crawford, the Second District also discounted the defendant’s failure to return money after promising its return. “[A] mere promise to return money would not be sufficient to establish a criminal intent.” Id. Moreover, the deposit money lost its character as monies belonging to the owner once it was deposited in the defendant’s account. The court concluded, “[although there may be a serious question as to whether his performance was adequate, this appears to be a civil rather than a criminal issue.” Id.
We have also found that partial performance of a contract negates felonious intent. In Yerrick, the defendant had taken a deposit to repair a fence. He did partly perform the contract by taking down the old fence even though he did not follow through with the rest of the repairs. Thus, our court found that because of the part performance no felonious intent was present when the deposit was received. 979 So.2d at 1281.
Contractual cases do not lend themselves to a conclusion that felonious intent is present at the inception of agreements. In Adams v. State, 443 So.2d 1003, 1007 (Fla. 2d DCA 1983), the court also found no felonious intent to steal an investor’s deposit. There, the defendant had an ongoing business of rabbit breeding. Through his corporation he sought buyers to breed and raise rabbits after purchasing his rabbit breeding kit. Although each breeder could sell the rabbit pelts individually, the defendant also had a company to purchase the pelts. When that company failed, some of its employees fostered dissent among the buyers and informed new buyers that the rabbit pelts were of inferior quality. The state charged the defendant with grand theft when new purchasers terminated their contract, and the defendant promised, but failed, to return their monies. In reversing the defendant’s conviction for grand theft in Adams, the Second District relied on Maddox v. State, 38 So.2d 58, 59 (Fla.1948), and its holding that where a “taking was in the open, with no subsequent attempt to conceal it, and there was no concealment nor denial of such taking, but on the other hand, an express avowal thereof, [this] tends to raise a strong presumption that the appellant had no felonious intent....” Under that holding, the court concluded that the state could not show felonious intent in Adams. 443 So.2d at 1007.
Applying these holdings to this case, we conclude that, like Crawford, Yer-rick, Adams, and Martin, the state has failed to prove felonious intent. Its evidence was not inconsistent with appellant’s hypothesis that this was simply a contractual undertaking which he failed to perform — a civil matter. The appellant had a legitimate business constructing cabinetry. He advertised for business. The homeowner saw his work space and his equipment. They entered into a written contract to construct the kitchen using thirty-inch cabinets after considerable negotiation. After the signing of the contract, even the state’s evidence showed that ma *745 terials were purchased at Lowe’s, and that the appellant made several rental payments on his work space where the cabinets would be constructed, essential to the performance of the contract. The appellant also came out after the signing of the contract to measure for the cabinets. Thus, he did make efforts to perform the contract. The state presented no evidence of any willful misrepresentations to induce the homeowner to sign the contract.
While the owner and the appellant disputed the issue of the removal of the drop ceiling and increase of the cabinet size from thirty-inch cabinets to thirty-six inch cabinets, it is significant that the contract provided for the smaller cabinets, and the thirty-six inch cabinets would be a change to the contract. Despite these disputes in the performance of the contract, they are not inconsistent with appellant’s hypothesis that when the contract was entered into, he had no felonious intent. Like Crawford, this matter should have been settled in civil court rather than criminal court.
For these reasons, we reverse and direct the court to vacate appellant’s conviction and sentence.
POLEN and DAMOORGIAN, JJ., concur.